**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BERNARD J. COBETTO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-1677** |
| | ) | |
| **WYETH PHARMACEUTICALS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

Before the Court for disposition are DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (*Document No. 37*), Defendant's Memorandum of Law in Support of Motion for Summary Judgment (*Document No. 39*), Plaintiff's Brief in Opposition to Summary Judgment Motion (*Document No. 42*), Defendant's Reply Brief in Support of Motion for Summary Judgment (*Document No. 46*), Plaintiff's Surreply to Summary Judgment Motion (*Document No. 50*), and Defendant's Response to Plaintiff's Surreply Submission (*Document No. 52*).  For the reasons that follow, Defendant's Motion for Summary Judgment will be granted.

**Background**

Plaintiff Bernard J. Cobetto ("Cobetto") began his employment as a sales representative for a predecessor company to Defendant Wyeth Pharmaceuticals ("Wyeth") in 1987.  (Doc. Nos. 38, p. 1, ¶ 1, 43, p. 1, ¶ 1).  Wyeth's organization consists of several different business units, one of which is dedicated to the sale of vaccines.  (Doc. Nos. 38, p. 1, ¶ 2, 43, p. 1, ¶ 2).  At all times relevant to this case, the Vaccines Business Unit was divided into four geographic regions, each of which was supervised by an Area Business Director.  *Id.*  Cobetto worked in the Northeast Region, and his Area Business Director was Kenneth Dennison ("Dennison").  *Id.*  For most of his career, Cobetto was the Territory Manager for the P1400 District of the Northeast Region. (Doc. Nos. 38, p. 2, ¶ 3, 43, p. 1, ¶ 3).

At one time, Morgan Berger ("Berger") was Cobetto's District Manager.  (Doc. Nos. 38, p. 2, ¶ 4, 43, p. 1, ¶ 4).  In June 2001, Berger was replaced by Kimberly Bencker ("Bencker").  *Id.*

1

Bencker became the Area Development Manager around the middle of 2003.  *Id.*  In September 2003, John Scott ("Scott") became Cobetto's immediate supervisor.  *Id.*  As a Territory Manager, Cobetto's duties included contacting physicians in his geographical region for the purpose of "detailing" (i.e., promoting) the Vaccines Business Unit's products.  (Doc. Nos. 38, p. 2, ¶ 5, 43, p. 1, ¶ 5).

In order to ensure compliance with all relevant laws, rules and regulations, Wyeth has adopted Policy 511.  (Doc. Nos. 38, p. 2, ¶ 6, 43, p. 1, ¶ 6).  Policy 511 covers a variety of marketing and sales practices, prescribing rules governing the use of promotional materials.  (Doc. Nos. 38, pp. 2-3, ¶ 7, 43, p. 1, ¶ 7).  Wyeth has a Copy Clearance Committee ("CCC"), which includes several legal, regulatory and global affairs employees.  (Doc. Nos. 38, p. 3, ¶ 8, 43, p. 1, ¶ 8).  Section III.E of Policy 511, in pertinent part, provides:

> All promotional materials must be approved by a Wyeth CCC prior to use.  Under no circumstances are field sales personnel permitted to create or alter promotional materials.  Any item that has a product or company name on it must be approved in accordance with the CCC review process prior to distribution to customers.

(Doc. Nos. 38, p. 3, ¶ 7, 43, p. 1, ¶ 7).  Policy 511 also includes an "Overview" section, which provides:

> In some respects, this policy is more restrictive than what the law or industry and professional standards require.  Nevertheless, Policy 511 is our policy, and you are expected to follow it.  Any deviations from this policy may result in disciplinary action, including termination of employment.

(Doc. Nos. 38, p. 3, ¶ 9, 43, p. 1, ¶ 9).  Policy 511 was periodically distributed to Wyeth's sales representatives, and periodic training about it was provided as well.  (Doc. No. 38, p. 3, ¶ 10, 43, p. 1, ¶ 10).  In June 2001, Cobetto received a letter from the President of Wyeth's Vaccines Division discussing the importance of Policy 511.  (Doc. Nos. 38, p. 3, ¶ 11, 43, p. 1, ¶ 11).  In December 2002, he received a letter from Wyeth's Vice President and Chief Counsel emphasizing the importance placed on Policy 511 by Wyeth.  (Doc. Nos. 38, p. 4, ¶ 12, 43, p. 1, ¶ 12).  No promotional materials were distributed to Wyeth's Territory Managers for distribution to physicians without first being approved by a CCC.  (Doc. Nos. 38, p. 4, ¶ 13, 43, p. 1, ¶ 13).

On May 23, 2002, Dennison and Bencker met with Cobetto to discuss his activities with

customers.  (Doc. Nos. 38, p. 4, ¶ 14, 43, pp. 1-2, ¶ 14).  One day later, Bencker sent Cobetto a memorandum entitled "Appropriate Communications."  *Id.*  The memorandum directed Cobetto as follows:

- Conduct your promotional and service activities only with those customers assigned to you.  Specifically, you are not to conduct business with West Virginia State immunization officials.  Refer any inquiries from them or on their behalf through our Specialty Account Manager and District Manager.

- Constrain all discussions you have as an employee of Wyeth to company approved POA communications.  It is not appropriate to express personal opinions about customers or the company during the conduct of your selling activities.  Unapproved discussion of confidential or unauthorized complaints to customers which place a false and unfavorable light on the company could lead to disciplinary action, including discharge.

- Do not distribute unauthorized literature, e.g. newspaper articles at company meetings to your colleagues.  Follow your District Manager's guidance and use only approved POA material.

   ***

   You are expected to conduct your work behaviors and communications in accordance with the company values and policy with respect to colleagues and customers.  You are directed to review the Territory Manager responsibilities, Job Profile, Code of Conduct and Corporate Values brochure and ensure that you understand and follow these important guides.  Failure to do so in a fully cooperative manner may result in disciplinary action, including discharge.

(Doc. Nos. 38, pp. 4-5, ¶¶ 15-16, 43, p. 2, ¶¶ 15-16).  In October 2002, Bencker reviewed Cobetto's expense reports for the previous month.  (Doc. Nos. 38, p. 5, ¶ 17, 43, pp. 2-3, ¶ 17).  She discovered that Cobetto had been making copies of Vaccine Information Sheets ("VIS") published by the Center for Disease Control ("CDC") for distribution to physicians.  *Id.*  Cobetto was warned about copying VIS sheets, or any other non-approved promotional materials, because it was in violation of Wyeth's policies.  (Doc. Nos. 38, p. 5, ¶ 19, 43, p. 3, ¶ 19).

On November 25, 2002, Cobetto was notified that he was placed "On Notice" because of his job performance.  (Doc. Nos. 38, p. 6, ¶ 20, 43, p. 3, ¶ 20).  In a memorandum, Bencker warned him again that he should not copy non-approved material or engage in inappropriate

communications.  *Id.*  Cobetto received a copy of Policy 511 in December 2002, along with a letter about its importance.  (Doc. Nos. 38, p. 6, ¶ 21, 43, p. 3, ¶ 21).  On March 21, 2003, Bencker removed Cobetto from "On Notice" status.  (Doc. Nos. 38, p. 6, ¶ 22, 43, p. 3, ¶ 22).  Nonetheless, in a letter to Cobetto, Bencker warned that she would recommend that he be terminated if he violated any Wyeth policies or procedures within the following twelve months.  *Id.*

During the middle of September 2003, Scott became Cobetto's District Manager.  (Doc. Nos. 38, p. 6, ¶ 23, 43, p. 3, ¶ 23).  Scott held a meeting with the sales representatives for District P1400 on September 16, 2003, at which Policy 511 was discussed.  (Doc. Nos. 38, pp. 6-7, ¶¶ 24-25, 43, p. 3, ¶¶ 24-25).  Three days later, Cobetto signed a form acknowledging that he understood Policy 511, and that he was obligated to contact his supervisor if he had any questions about it.  (Doc. Nos. 38, p. 7, ¶ 26, 43, p. 3, ¶ 26).  Shortly thereafter, Scott sent a voicemail message to the sales representatives stating that they should not have any unapproved materials in their vehicles.  (Doc. Nos. 38, p. 7, ¶ 27, 43, p. 3, ¶ 27).  Cobetto was very familiar with Policy 511, received periodic training concerning Wyeth's expectations, and received occasional voicemail messages indicating that sales representatives were only permitted to distribute materials which had been approved by a CCC.  (Doc. Nos. 38, p. 8, ¶ 29, 43, p. 4, ¶ 29).

Scott received a letter from Dr. Kelly R. Nelson dated October 7, 2003.  (Doc. Nos. 38, pp. 8-9, ¶ 30, 43, p. 4, ¶ 30).  The letter stated, in pertinent part, as follows:

> Mr. Cobetto has been selling us flu mist.  I have some very serious issues with Mr. Cobetto and as his supervisor felt it was appropriate to share them with you.  Mr. Cobetto made a detail call to my practice Medbrook Medical Associates on October 6, 2003.  As he was leaving he took it upon himself to hang flu mist signs throughout my building including two signs on the front door of my office.  This was done without asking permission of myself or any of my associates.  That type of behavior is totally inappropriate, cannot and will not be tolerated within this practice.  I discussed that with Mr. Cobetto and at this stage I feel the best solution is that he not be a sales representative in this practice.

(Doc. No. 40-4, p. 17).  Scott rode with Cobetto in the field from October 14-15, 2003.  (Doc. Nos. 38, p. 9, ¶ 31, 43, p. 4, ¶ 31).  Scott and Cobetto spoke about Dr. Nelson's complaint.  (Doc.

Nos. 38, p. 9, ¶ 32, 43, p. 4, ¶ 32).  During this conversation, Cobetto admitted that he had

distributed a VIS sheet to Dr. Nelson's head nurse.  *Id.*  The document had apparently not been

approved by a CCC.  *Id.*  The subject of the VIS sheet was a Wyeth product known as Flu Mist.

(Doc. Nos. 38, p. 9, ¶ 33, 43, p. 4, ¶ 33).  Cobetto apparently admitted that he had distributed the

same document to other medical offices.  *Id.*  While accompanying Cobetto on a call to the West

Virginia University Pediatric Clinic, Scott noticed that Cobetto had an altered reprint about

Prevnar, another Wyeth product.  (Doc. Nos. 38, p. 9, ¶ 34, 43, pp. 4-5, ¶ 34).  Portions of it were

underlined, highlighted, and marked with asterisks.  *Id.*  Policy 511 apparently prohibited the use

of altered materials.  *Id.*

> In a memorandum to Dennison dated October 15, 2003, Scott stated:
>
> During my field visit with Bernie Cobetto (P140R) on October 14th and 15th I
> became aware of two violations of Policy 511.  The first violation was discovered
> during a counseling session for a violation of "Conduct in the Workplace".
> Bernie told me that he distributed the FluMist[] VIS to the head nurse for Dr.
> Kelly Nelson.  When questioned he said he distributed this to numerous practices.
>
> The second violation occurred during a call on the University of West Virginia
> Pediatric Group Clinic.  Bernie used an altered Prevnar[] reprint–<u>Efficacy, safety
> and immunogenicity of heptavalent pneumococcal conjugate vaccine in children</u>.
> The reprint contained sections that were underlined, highlighted, and marked with
> asterisks.
>
> Bernie was previously counseled for a violation of "Conduct in the Workplace".  I
> recommend involuntary dismissal because of the violations of Policy 511 and the
> history of conduct violations.

(Doc. No. 40-8, p. 27).  The next day, Dennison sent a memorandum to William Campbell

("Campbell") and Wanda Maddrey-Randolph ("Maddrey-Randolph") indicating that he agreed

with Scott's recommendation that Cobetto be dismissed.[1]  (Doc. No. 40-9, p. 3).  Upon the

concurrence of Campbell, Cobetto's employment with Wyeth was terminated on January 30,

2004.  (Doc. Nos. 38, p. 11, ¶ 41, 43, p. 5, ¶ 41).  Cobetto's termination did not result in the loss

of his vested benefits under Wyeth's defined benefit pension plan.  (Doc. Nos. 38, pp. 11-12, ¶

---

[1]Campbell was Wyeth's Vice President of Vaccines Sales, and Maddrey-Randolph
worked for Wyeth's Human Resources Department.  (Doc. No. 29, p. 1).

46, 43, p. 5, ¶ 46).  He was still eligible to receive pension benefits.  *Id.*

In December 2003, Wyeth hired Kathleen Borgese ("Borgese") as a Territory Manager assigned to Scott's district.  (Doc. Nos. 38, p. 12, ¶ 48, 43, p. 6, ¶ 48).  Her date of birth was August 2, 1956, making her 47 years of age at the time of her hiring.  *Id.*  During the spring of 2004, Wyeth hired Devin Gosnell ("Gosnell") to serve as the Territory Manager for Cobetto's former territory.  (Doc. Nos. 38, p. 12, ¶ 47, 43, p. 5, ¶ 47).  Gosnell's date of birth was October 15, 1976, making him 27 years of age at the time of his hiring.  *Id.*  Cobetto's date of birth was September 6, 1951.  (Doc. Nos. 38, p. 12, ¶ 49, 43, p. 6, ¶ 49).  Hence, he was 52 years old at the time of his termination.  Moreover, at the time of Cobetto's discharge, Dennison was 54 years of age, Scott was 42 years of age, Campbell was 44 years of age, and Maddrey-Randolph was 57 years of age.  (Doc. Nos. 38, p. 12, ¶¶ 50-53, 43, p. 6, ¶¶ 50-53).  As of November 1, 2006, the date of her deposition, Bencker was 41 years of age.  (Doc. Nos. 38, p. 12, ¶ 54, 40-7, p. 14, 43, p. 6, ¶ 54).

In September 2003, Stephen Kluewer ("Kluewer") was terminated by Wyeth.  (Doc. Nos. 38, p. 13, ¶ 56, 43, p. 6, ¶ 56).  He had been a District Manager in California.  *Id.*  Kluewer was terminated for violating Policy 511, inappropriately transferring Prevnar, and retaliating against an employee in an unwarranted manner.[2]  *Id.*  His date of birth was April 28, 1947, making him 56 years of age at the time of his termination.  *Id.*  Bret Flanders ("Flanders") received a warning letter for taking a physician out to lunch in September 2003.  (Doc. Nos. 38, p. 13, ¶ 57, 43, p. 6, ¶ 57).  He submitted his resignation in March 2004.  *Id.*  His date of birth was August 29, 1968, making him 35 years of age on the date of his resignation.  *Id.*  Anthony Lepore ("Lepore") was terminated by Wyeth on April 30, 2003.  (Doc. Nos. 38, p. 14, ¶ 62, 43, p. 6, ¶ 62).  He was 55 years old at the time.  *Id.*  Jane Maruca ("Maruca") began working as a Territory Manager in a realigned territory in April 2003.  (Doc. Nos. 38, p. 15, ¶ 66, 43, p. 7, ¶ 66).

Other Wyeth employees have received warning letters concerning Policy 511.  In October 2003, Danilo Sapad ("Sapad") received a warning letter for creating and using a homemade,

---

[2]The record indicates that Kluewer was terminated after retaliating against a female sales representative who had reported a physician for making inappropriate comments or gestures in her presence.  (Doc. No. 45-18, pp. 39-46).

unapproved car magnet to advertise Flu Mist.  (Doc. Nos. 38, p. 13, ¶ 58, 43, p. 6, ¶ 58).  He was born on December 3, 1953, making him 49 years of age at the time of the incident.  *Id.*  Dan Fuller ("Fuller") is a Territory Manager in Ohio.  (Doc. Nos. 38, pp. 13-14, ¶ 59, 43, p. 6, ¶ 59).  Fuller, who is the same age as Cobetto, received an oral warning and two written warning letters concerning compliance with Policy 511.  *Id.*  Sapad and Fuller both remain employed by Wyeth.  (Doc. Nos. 38, pp. 13-14, ¶¶ 58-59, 43, p. 6, ¶¶ 58-59).

Cobetto filed a charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC") on June 11, 2004, alleging that he was illegally discharged because of his sex and age.  (Doc. No. 1-3, pp. 2-3, ¶¶ 5-21).  The charge was dual-filed with the Equal Employment Opportunity Commission ("EEOC").  (Doc. No. 1-3, p. 3, ¶ 22).  Cobetto's charge was apparently dismissed by the PHRC.  On December 1, 2005, the EEOC informed Cobetto that it had adopted the findings of the PHRC, that it was closing its file in the case, and that Cobetto could pursue remedies in court if he so desired.  (Doc. No. 1-3, p. 6).

Cobetto commenced this action against Wyeth on December 5, 2005, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*], the Age Discrimination in Employment Act ("ADEA") [29 U.S.C. § 621 *et seq.*], the Employee Retirement Income Security Act ("ERISA") [29 U.S.C. § 1001 *et seq.*], and the Pennsylvania Human Relations Act ("PHRA") [43 P.S. § 951 *et seq.*].  (Doc. No. 1, pp. 7-9, ¶¶ 30-46).  Wyeth filed a motion for summary judgment on March 30, 2007.  (Doc. No. 37).  This motion has been thoroughly briefed and, consequently, is the subject of this memorandum opinion.

Jurisdiction over Cobetto's federal claims is predicated on 28 U.S.C. § 1331, 29 U.S.C. §§ 626 and 1132, and 42 U.S.C. § 2000e-5(f)(3).  The Court has supplemental jurisdiction over Cobetto's PHRA claims pursuant to 28 U.S.C. § 1367.  Venue is proper under 28 U.S.C. § 1391(b).

### Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

[Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

> The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Celotex*, 477 U.S. at 323. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)). Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. If the moving party has carried this burden, the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230. When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment.

*Anderson*, 477 U.S. at 249-250.

**Discussion**

Cobetto's federal claims arise under Title VII, the ADEA and the ERISA.  (Doc. No. 1, pp. 7-9, ¶¶ 30-43).  The Court will address each of these claims separately.  Cobetto also alleges violations of the PHRA for discrimination on the basis of sex and age.  (Doc. No. 1, p. 9, ¶¶ 44-46).  Generally speaking, the Pennsylvania courts interpret the PHRA in accordance with Title VII and the ADEA.  *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996).  For this reason, in the absence of contrary guidance from the Pennsylvania courts, the provisions of the PHRA are construed to be coextensive with its federal counterparts unless the relevant statutory language in the PHRA indicates that a different construction is warranted.  *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).  In this case, the parties do not argue that the PHRA should be construed differently than Title VII or the ADEA.  Therefore, the Court's discussion about Cobetto's claims under Title VII and the ADEA will also be dispositive of his claims under the PHRA for sex and age discrimination.

Before proceeding to the merits of Cobetto's claims, the Court must take note of a few preliminary points.  Since this is an employment discrimination case in which no direct evidence of discrimination is presented, the United States Supreme Court's analyses in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), provide the formulation for allocating the requisite burdens of proof and production for purposes of the instant motion for summary judgment.  In a federal employment discrimination case such as this, the plaintiff must establish a *prima facie* case of impermissible discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If a *prima facie* case is established, the defendant must articulate legitimate, nondiscriminatory reasons for the plaintiff's adverse treatment.  *Id.* at 802-803.  If the defendant articulates legitimate, nondiscriminatory reasons for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reasons given by the defendant for such treatment are merely a pretext for illegal employment discrimination.  *Id.* at 804-805.  Evidence that an employer's stated reasons for an adverse employment action are unworthy of credence is a form of circumstantial evidence that a plaintiff can use to establish the existence of intentional discrimination.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

9

The requirement that the plaintiff establish a *prima facie* case of unlawful discrimination under the applicable statutes "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), cert. denied, 515 U.S. 1159 (1995). A *prima facie* case raises an inference of unlawful discrimination because the courts presume that the challenged actions, if left unexplained, were "more likely than not based on the consideration of impermissible factors." *Id.* Nevertheless, it must be remembered that the *McDonnell Douglas-Burdine* framework "was never intended to be rigid, mechanized, or ritualistic." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978). This is especially true with respect to the plaintiff's need to establish a *prima facie* case. In *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit made it clear that "the elements of a *prima facie* case depend on the facts of the particular case[,]" and that "a *prima facie* case cannot be established on a one-size-fits-all basis." Thus, "the *prima facie* test remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Service*, 352 F.3d 789, 797-798 (3d Cir. 2003).

The *McDonnell Douglas-Burdine* framework does not apply in employment discrimination cases in which there is direct evidence of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). Direct evidence of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995). In cases in which direct evidence of discrimination is presented, there is no need for an "inference" of discrimination, since the discrimination itself is transparent. In this case, however, Cobetto has no direct evidence of discrimination.

In order to establish a *prima facie* case of sex discrimination under Title VII or age discrimination under the ADEA with respect to his discharge, Cobetto must show that: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he was discharged; and (4) his discharge occurred under circumstances giving rise to an inference of sex or age discrimination.[3] *Sarullo*, 352 F.3d at 797. With that in mind, the Court now turns to the relevant

---

[3]The Court recites the elements of a *prima facie* case in a general manner in order to accommodate differing factual settings and theories of liability. Although courts often state the

statutory language.

The relevant portion of Title VII provides:

**§ 2000e-2.  Unlawful employment practices**

**(a) Employer practices.**  It shall be an unlawful employment practice for an employer--

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).  Wyeth does not dispute that it is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year[.]" 42 U.S.C. § 2000e(b). Therefore, Wyeth is an "employer" for purposes of Title VII.  It is also undisputed that Cobetto was an "employee" for purposes of 42 U.S.C. § 2000e(f).  The relevant portion of the ADEA provides:

**§ 623.  Prohibition of age discrimination**

---

elements in Title VII cases in such a way as to require the plaintiff to show that he or she was replaced by someone outside of the relevant protected class, such a showing is not always necessary.  *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 353 (3d Cir. 1999)("Even if the plaintiff was replaced by someone within her own class, this simply demonstrates that the employer is willing to hire people from this class–which in the present context is presumably true of all but the most misogynistic employers–and does not establish that the employer did not fire the plaintiff on the basis of her protected status.").  Moreover, while courts often state that a plaintiff in an ADEA case must show that he or she was treated differently than someone who was both similarly situated and sufficiently younger, such a showing need not be made if other case-specific evidence exists which tends to create an inference of age discrimination. *Fitzpatrick v. National Mobile Television*, 364 F.Supp.2d 483, 491-492, n. 4 (M.D.Pa. 2005). The touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value*, not whether they fit into a mechanical formula. *O'Connor v. Consolidated Coin Caterers Corporation*, 517 U.S. 308, 312-313 (1996).

**(a) Employer practices.**  It shall be unlawful for an employer--
>    (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
>    (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
>    (3) to reduce the wage rate of any employee in order to comply with this Act.

29 U.S.C. § 623(a).  Wyeth concedes that it is "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year[.]" 29 U.S.C. § 630(b).  Consequently, it is an "employer" for purposes of the ADEA.  At the time of his discharge, Cobetto was an "employee" under 29 U.S.C. § 630(f).  The ADEA makes it clear that its prohibitions are "limited to individuals who are at least 40 years of age."  29 U.S.C. § 631(a).  Hence, only those 40 years of age and over may invoke the protections of the ADEA.[4]  Cobetto was within the class of persons protected under the ADEA at the time of his discharge.  In order to establish a violation of the ADEA, Cobetto must establish that his age "actually motived" Wyeth's decision to discharge him.  *Glanzman v. Metropolitan Management Corporation*, 391 F.3d 506, 512 (3d Cir. 2004).  This means that he must show that his age actually played a role in Wyeth's decisionmaking process and "had a determinative influence on the outcome."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141 (2000).

The Court's analysis of Cobetto's Title VII claim is slightly different because of the Civil Rights Act of 1991, which added the following statutory language:

**(m) Impermissible consideration of race, color, religion, sex, or national**

---

[4]The ADEA only prohibits discrimination in one direction (i.e., discrimination which favors the young at the expense of the old).  It does not prohibit employers from discriminating against younger individuals.  In *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 594-600 (2004), the United States Supreme Court held that the words "because of such individual's age," as they appear in 29 U.S.C. § 623(a)(1), essentially mean "because of such individual's [old or advanced] age."

**origin in employment practices.**  Except as otherwise provided in this title [42 U.S.C. § 2000e *et seq.*], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m).  In *Watson v. Southeastern Pennsylvania Transportation Authority*, 207 F.3d 207, 220 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit held that § 2000e-2(m) did not alter the pre-existing distinction between "pretext" cases and "mixed-motive" cases, and that plaintiffs attempting to proceed under a "pretext" theory of discrimination must still show that sex was a *determinative* (rather than just a *motivating*) factor behind the challenged employment practice.  The Court of Appeals, however, was proceeding on the assumption that these two kinds of cases could be neatly separated by reference to the "direct evidence" requirement discussed in Justice O'Connor's opinion concurring in the judgment in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).[5]  *Watson*, 207 F.3d at 212-220.  The Court of Appeals determined that § 2000e-2(m) was designed to overrule only the portion of Justice O'Connor's *Price Waterhouse* concurrence holding that a defendant could completely avoid a finding of liability by proving that it still would have taken the challenged action in the absence of the unlawful discriminatory motive.  *Id.*

   *Watson* was severely undermined by the Supreme Court's subsequent decision in *Desert Palace v. Costa*, 539 U.S. 90 (2003), which made it clear that § 2000e-2(m) should be construed for what it expressly provides, and not merely within the narrow confines of Justice O'Connor's *Price Waterhouse* concurrence.[6]  *Desert Palace*, 539 U.S. at 98 ("Like the Court of Appeals, we

_____

   [5]Although the Supreme Court has not resolved the question, the United States Court of Appeals for the Third Circuit recognizes Justice O'Connor's concurrence as the controlling opinion in *Price Waterhouse*.  *Conoshenti v. Public Service Electric & Gas Company*, 364 F.3d 135, 148, n. 11 (3d Cir. 2004).

   [6]In *Atkinson v. Lafayette College*, 460 F.3d 447, 455 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit appears to have applied *Watson* in a post-*Desert Palace* case.  It did so after observing, in a footnote, that the plaintiff was relying only on indirect evidence of discrimination.  *Atkinson*, 460 F.3d at 454, n. 7.  It appears that the Court of Appeals did not consider the effect of *Desert Palace* on *Watson*.  Nevertheless, in a subsequent

see no need to address which of the opinions in *Price Waterhouse* is controlling: the third step of petitioner's argument is flawed, primarily because it is inconsistent with the text of § 2000e-2(m).").  In *Desert Palace*, the Supreme Court held that direct evidence is *not* required in order for a plaintiff to obtain a "mixed-motive" instruction under § 2000e-2(m), and that such an instruction can be given if a plaintiff presents "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice."[7]  *Desert Palace*, 539 U.S. at 101 (internal quotation marks omitted).  Given the holding in *Desert Palace*, it is not clear whether *Watson* is

_____

unpublished decision, the Court of Appeals noted that the effects of *Desert Palace* on a court's summary judgment analysis remains unresolved.  *Houser v. Carpenter Technology Corporation*, 216 Fed. Appx. 263, 265, 2007 U.S. App. LEXIS 3557, at *5 (3d Cir. February 15, 2007)("Even if a 'mixed motive' analysis were appropriate at the summary judgment stage, which our court has not addressed, Houser cannot succeed under a 'mixed motives' approach, because Houser points to no evidence that would lead us to conclude that age played any role in his termination.").

[7]In the Court's view, the Supreme Court's reasoning in *Desert Palace* inevitably leads to the conclusion that summary judgment cannot be granted in favor of an employer if the plaintiff presents "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice."  *Desert Palace*, 539 U.S. at 101 (internal quotation marks omitted).  It makes no sense to impose a higher threshold on a plaintiff for purposes of summary judgment (i.e., the "determinative factor" test discussed in *Watson*) than would be imposed on that same plaintiff at trial (i.e., the more relaxed "motivating factor" test described in *Desert Palace*).  The Court of Appeals, of course, did not have the benefit of the Supreme Court's unanimous decision in *Desert Palace* when it decided *Watson*.  The reasoning in *Desert Palace* clearly contradicts the reasoning in *Watson*.  Compare *Desert Palace*, 539 U.S. at 99 ("Moreover, Congress explicitly defined the term 'demonstrates' in the 1991 Act, leaving little doubt that no special evidentiary showing is required."), with *Watson*, 207 F.3d at 218 ("By contrast, the term demonstrates is not the most apt choice if the drafters wanted to describe, not just cases in which the plaintiff offers 'direct' evidence of discriminatory animus, but also the great number of disparate treatment cases in which the plaintiff, proceeding under *McDonnell Douglas*, establishes the elements of a *prima facie* case and urges the factfinder to infer discriminatory animus from the employer's asserted failure to offer a credible alternative reason for the contested employment action.").  If the distinction between "pretext" cases and "mixed-motive" cases identified in *Watson* survived *Desert Palace*, it is not clear how the distinction between the two kinds of cases should be made.  *Desert Palace* clearly precludes the use of the "direct evidence" line of demarcation assumed by the Court of Appeals in *Watson*.

still viable, since the sharp distinction between "pretext" cases and "mixed-motive" cases identified in *Watson* was inextricably linked with the nature of the evidence presented by the plaintiff. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)(explaining that the *McDonnell Douglas* test, which is employed in "pretext" cases, is inapplicable where the plaintiff presents "direct evidence" of discrimination); *Fuller v. Phipps*, 67 F.3d 1137, 1143 (4th Cir. 1995)("Thus, whether a case is a pretext or mixed-motive case ultimately hinges on the strength of the evidence establishing discrimination.").[8]  In *Desert Palace*, the Supreme Court referred to a "mixed-motive" case as a case in which "both legitimate and illegitimate reasons motivated the decision." *Desert Palace*, 539 U.S. at 93.  Although the Supreme Court did not expressly hold that there was no distinction between "pretext" cases and "mixed-motive" cases, *Desert Palace*, 539 U.S. at 94, n. 1 ("This case does not require us to decide when, if ever, § 107 applies outside of the mixed-motive context."), it clearly rejected the "direct evidence" line of demarcation employed by the Court of Appeals in *Watson*.  Compare *Watson*, 207 F.3d at 217-218 ("The use of this very term in Section 107(a) makes perfect sense if the drafters wished to denote cases in which the plaintiff shows by what Justice O'Connor called 'direct evidence' that an impermissible factor played a role in the challenged decision."), with *Desert Palace*, 539 U.S. at 98-99 ("Section 2000e-2(m) unambiguously states that a plaintiff need only 'demonstrate' that an employer used a forbidden consideration with respect to 'any employment practice.'  On its face, the statute does not mention, much less require, that a plaintiff make a heightened showing through direct evidence.").

Earlier this year, in an unpublished opinion, the Court of Appeals noted that it is an open question whether a "mixed-motive" analysis is appropriate at the summary judgment stage. *Houser v. Carpenter Technology Corporation*, 216 Fed. Appx. 263, 265, 2007 WL 490994, 2007 U.S. App. LEXIS 3557, at *4-5 (3d Cir. February 15, 2007).  Nevertheless, it is clear that a

---

[8]In *Watson*, the Third Circuit expressly relied on the Fourth Circuit's decision in *Fuller* to support its decision.  *Watson*, 207 F.3d at 211, n. 1.  In *Desert Palace*, the Supreme Court expressly rejected the reasoning in *Fuller*.  *Desert Palace*, 539 U.S. at 95.  While the Supreme Court observed that it had no occasion to determine when, if ever, § 2000e-2(m) applies outside of the so-called "mixed-motive" context, its reasoning may have eliminated the basis for distinguishing between "pretext" and "mixed-motive" cases in the first place.  *Id.* at 94, n. 1.

plaintiff need not specify whether he or she intends to proceed under a "pretext" or a "mixed-motive" theory, and that the same case can proceed under both theories.[9]  *Armbruster v. Unisys Corporation*, 32 F.3d 768, 781-782 (3d Cir. 1994).  Prior to *Desert Palace*, the general rule was that a case could be deemed to be a "mixed-motive" case only upon a showing of direct evidence of discrimination.  *Miller v. Cigna Corporation*, 47 F.3d 586, 597, n. 9 (3d Cir. 1995)(explaining that so-called "mixed-motive" cases were cases not only in which the record would support a conclusion that both legitimate and illegitimate factors played a role in the employer's adverse employment decision, but in which the plaintiff's evidence of discrimination was "sufficiently direct" to shift the burden of proof to the employer on the issue of whether the same adverse employment decision would have been made in the absence of the discriminatory motive); *Fuller*, 67 F.3d at 1143 ("Moreover, even if believed, Fuller's allegations do not involve the sort of direct evidence that is necessary to establish a mixed-motive case.").  In the aftermath of *Desert Palace*, however, it is clear that direct evidence of discrimination is not needed in order for a plaintiff to have a so-called "mixed-motive case."  Virginia A. Berlando, *Employment Discrimination Claimants are Not Required to Exhibit Direct Evidence of Discrimination: Desert Palace, Inc. v. Costa*, 6 Duq.B.L.J. 267, 268-283 (2004).

Since it is easier for a plaintiff to show that gender was a *motivating* factor in an adverse employment decision than it is for a plaintiff to show that gender was a *determinative* factor in an adverse employment decision, the extent to which *Desert Palace* undermined (or perhaps even

---

[9]The Court cannot determine, at the summary judgment stage, whether Cobetto would attempt to proceed solely under a "pretext" theory, solely under a "mixed-motive" theory, or under a theory involving a confluence of the two if he were able to defeat Wyeth's motion for summary judgment.  (Doc. No. 42, p. 1)(arguing that "summary judgment is inappropriate if Cobetto can show [that] the articulated reasons for dismissal are pretext *or* if there is evidence which would permit a jury to believe that an invidious discriminatory reason was more likely than not the *motivating factor* for Wyeth's decision")(emphasis added).  There is some confusion about how such matters should be handled within the context of a motion for summary judgment. *Sanders v. City of Montgomery*, 319 F.Supp.2d 1296, 1314-1315 (M.D.Ala. 2004)(examining the differing approaches taken by various federal courts).  This Court is convinced that it would be improper to grant summary judgment to a defendant solely on the basis of a "pretext" evaluation if the evidence in the record could sustain a potential jury determination that sex was a "motivating factor" in an adverse employment decision.  42 U.S.C. § 2000e-2(m).

abrogated) *Watson* is of critical importance.  For this reason, the Court will assume *arguendo* that Cobetto can defeat Wyeth's motion for summary judgment by showing that his gender was a *motivating* (rather than a *determinative*) factor in the decision to discharge him, since the language of § 2000e-2(m) makes it clear that such a showing is sufficient to establish an "unlawful employment practice."[10]  *Quantum Chemical Corporation v. Toennies*, 47 S.W.3d 473, 478 (Tex. 2001)("Establishing an unlawful employment practice is, of course, the entire point of a plaintiff's suit, no matter how it is judicially classified.").  Regardless of whether Cobetto intends to proceed under a "pretext" theory or a "mixed-motive" theory, the ultimate question is whether Wyeth engaged in the "unlawful employment practice" of *discharging* him *because of his sex*.  42 U.S.C. § 2000e-2(a).  If Cobetto is unable to establish that his gender was a *motivating* factor in Wyeth's decision to discharge him, he obviously cannot meet the more difficult burden of establishing that his gender was a *determinative* factor in Wyeth's decision to discharge him.  *Mock v. University of Pittsburgh at Johnstown*, 2007 WL 2253602, at *19, 2007 U.S. Dist. LEXIS 56741, at *64, n. 11 (W.D.Pa. August 3, 2007).  Since the Court is convinced that no reasonable jury could conclude that Cobetto's gender was a *motivating* factor in Wyeth's decision to discharge him, it is appropriate for the Court to apply the standard applicable under §

---

[10]Although not directly relevant to the Court's analysis in this case, it is noteworthy that 42 U.S.C. § 2000e-5(g)(2)(B) provides a partial affirmative defense for an employer able to establish that it "would have taken the same action in the absence of the impermissible motivating factor[.]" 42 U.S.C. § 2000e-5(g)(2)(B).  Upon such a showing, a court can still grant declaratory and injunctive relief, as well as "attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim" under § 2000e-2(m), but may not "award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment[.]" 42 U.S.C. § 2000e-5(g)(2)(B)(i)-(ii); *Desert Palace*, 539 U.S. at 94-95.  In his complaint, Cobetto does not seek declaratory or injunctive relief.  (Doc. No. 1).  Instead, he seeks compensatory damages for lost wages and benefits, punitive damages, and counsel fees.  *Id.*  Since he seeks counsel fees, which he could obtain upon a showing that gender was a *motivating* factor in Wyeth's decision to discharge him (even if Wyeth were able to show that Cobetto's gender was not a *determinative* factor in the discharge decision), the Court will consider the evidence in the record with § 2000e-2(m)'s "motivating factor" standard in mind.  *Mock v. University of Pittsburgh at Johnstown*, 2007 WL 2253602, at *19, 2007 U.S. Dist. LEXIS 56741, at*63-64 (W.D.Pa. August 3, 2007).

2000e-2(m), which is the lowest common denominator between the two alternative standards.[11]
*Houser*, 216 Fed. Appx. at 265, 2007 WL 490994, 2007 U.S. App. LEXIS 3557, at *4-5
(declining to decide whether a "mixed-motive" analysis should be employed at the summary
judgment stage because there was insufficient evidence to satisfy even the more relaxed
*motivating* factor standard).

In support of its motion for summary judgment, Wyeth argues that Cobetto cannot rebut
its legitimate, nondiscriminatory reason for terminating him.  (Doc. No. 39, pp. 7-16).  It is not
clear to the Court whether Wyeth is conceding that Cobetto has established a *prima facie* case of
discrimination under Title VII and the ADEA.  Nonetheless, the Court assumes *arguendo* that
Cobetto has satisfied the *prima facie* hurdle with respect to his claims under Title VII and the
ADEA.  Since he cannot rebut Wyeth's legitimate, nondiscriminatory reason for discharging him,
Wyeth is entitled to summary judgment.

In his deposition, Cobetto acknowledged that he had violated Policy 511.  He testified
that every Wyeth sales representative distributed VIS sheets approved by the Center for Disease
Control ("CDC") even if they had not been approved by a Wyeth CCC.  (Doc. No. 40-2, p. 30).
In his view, Wyeth was not justified in firing him without firing the other sales representatives
who had violated Policy 511.  Cobetto further acknowledged that he had distributed unapproved
VIS sheets to physicians and nurses on several occasions.  (Doc. No. 45-10, p. 28).  During the
fall of 2002, Bencker was Cobetto's immediate supervisor.  She found out that he had been
distributing VIS sheets to doctors and nurses when she noticed that his expense report for
September 2002 included a relatively high expense figure.  (Doc. No. 40-2, p. 32).  When asked
by Bencker about his expenses, Cobetto admitted to her that his expense report was high because
he had made copies of VIS sheets for the purpose of distributing them to customers.  (Doc. No.
45-10, p. 28).  Bencker warned him that his actions were in violation of Wyeth's policies, and
that he could not continue to distribute material which was not approved by a Wyeth CCC.  *Id.*

---

[11]By its very terms, § 2000e-2(m) applies only to discrimination based on race, color,
religion, sex, or national origin.  42 U.S.C. § 2000e-2(m).  Thus, it has no application to
Cobetto's claim under the ADEA.  *Glanzman v. Metropolitan Management Corporation*, 391
F.3d 506, 512, n. 3 (3d Cir. 2004).

To some extent, Cobetto may have believed that Wyeth's supervisors were acquiescing in sales representatives' use of VIS sheets, even if they had not been approved by a CCC.  (Doc. No. 45-12, p. 32).  In any event, he did not deny that his use of such unapproved VIS sheets were in violation of Wyeth's company policies.  (Doc. No. 45-12, p. 31).

It is undisputed that, at the time of Cobetto's termination, Scott was his immediate supervisor.  In her deposition, Bencker testified that she and Scott did not spend much time discussing the performance of specific sales representatives, and that she had simply given Scott a box containing the records detailing representatives' performance during her time as the District Manager.  (Doc. No. 45-16, pp. 29-30)  Scott testified that his discussions with Bencker concerning the performance of specific sales representatives had been "very minor," and that the only thing that Bencker had told him about Cobetto was that the box contained documentation of his performance improvement program.  (Doc. No. 45-17, pp. 68-69).  Scott explained that he had become aware of Cobetto's history of Policy 511 violations by reviewing the file.  (Doc. No. 45-17, p. 68).

Scott became Cobetto's District Manager during the middle of September 2003.  (Doc. Nos. 38, p. 6, ¶ 23, 43, p. 3, ¶ 23).  The incident involving Dr. Nelson occurred just a few weeks later.  After Cobetto had placed a FluMist poster up in Dr. Nelson's office without obtaining permission to do so, Dr. Nelson sent Scott a letter complaining about Cobetto's conduct.  (Doc. No. 40-4, p. 17).  Dr. Nelson essentially banned Cobetto from returning to his office. *Id.*  The record is not clear as to whether Dr. Nelson had permitted Cobetto to hang posters in his office on prior occasions.  Cobetto testified that it was common for him to leave posters behind when he did not get to see a physician.  (Doc. No. 40-2, pp. 47-48).  He further testified that he admitted to Scott that he had distributed FluMist VIS sheets to numerous medical offices.  (Doc. No. 40-2, p. 51).  According to Scott, Dr. Nelson's complaint about Cobetto was the only written complaint about a sales representative's conduct that he had ever received.  (Doc. No. 45-17, p. 41).

Scott accompanied Cobetto in the field from October 14-15, 2003.  Scott apparently became aware of Cobetto's routine distribution of FluMist VIS sheets during this field visit.  (Doc. No. 40-8, p. 27).  Cobetto also committed a further violation of Policy 511 at that time.

19

During a visit to the West Virginia Pediatric Group Clinic, Cobetto used an altered Prevnar reprint.  *Id.*  The reprint contained sections which were underlined, highlighted, and marked with asterisks.  *Id.*  The unaltered reprint had been previously approved by a Wyeth CCC.  Cobetto testified that his intention was to use an unaltered copy of the article, but that he mistakenly pulled out the altered copy instead.  (Doc. No. 45-12, pp. 36-37).  Scott pulled the altered copy of the article out of his hands.  *Id.*  Cobetto also showed a FluMist VIS sheet to a nurse in West Virginia.  In his deposition, he testified that his purpose for showing the VIS sheet to the nurse was to point out an inconsistency between the information on the VIS sheet and that contained in the package insert.  (Doc. No. 45-12, p. 30).  According to Cobetto, the VIS sheet (which was created by the CDC) stated that the FluMist vaccine could be given to children concurrently with other vaccines, whereas the package insert contained information to the contrary.  *Id.*  Scott implicitly acknowledged the existence of a discrepancy between the VIS sheet and the package insert when he testified that Wyeth could only promote its products in accordance with its own labeling, and that it could not rely on allegedly incorrect information supplied by the CDC.  (Doc. No. 45-17, pp. 71-72).

According to Scott, he decided to recommend Cobetto's termination after Dennison asked him for a recommendation.  (Doc. No. 45-17, p. 70).  He put his recommendation in writing at Dennison's request.  (Doc. No. 40-8, p. 27).  In a memorandum dated October 16, 2003, Dennison informed Campbell and Maddrey-Randolph that he fully concurred with Scott's decision to recommend Cobetto's discharge.  (Doc. No. 40-9, p. 3).  Scott and Dennison apparently agreed to terminate Cobetto because of his history of violating Wyeth policies.  (Doc. Nos. 40-8, p. 27, 40-9, p. 3).  Although Bencker was present when Scott informed Cobetto of his discharge, she testified that she had been there only as a witness.  (Doc. No. 45-16, p. 29).  She indicated that Dennison had informed her of Wyeth's decision to discharge Cobetto after the decision had already been made.  *Id.*

Dennison testified that, at one time, Wyeth sales representatives had been permitted to distribute materials prepared by the CDC to physicians and nurses.  (Doc. No. 45-14, pp. 35-36).  Nevertheless, he explained that the FluMist VIS sheet was never supposed to be used for promotional purposes, since it was inconsistent with Wyeth's own labeling of the product.  (Doc.

No. 45-14, pp. 41-42).  He had no idea whether Cobetto's use of the FluMist VIS sheet had been for the purpose of illustrating the inconsistency between the VIS sheet and the package insert. (Doc. No. 45-15, p. 6).

Campbell's deposition sheds more light on Wyeth's policies concerning the use of materials which have not been approved by a CCC.  He explained that a Wyeth sales representative would have known that a document had been approved by a CCC because he or she would have received it directly from the company.  (Doc. No. 45-18, p. 14).  He made it clear that the use of an altered document (even one previously approved by a CCC in its unaltered form) would constitute a serious violation of Policy 511.  (Doc. No. 45-18, p. 15).  According to Campbell, the question of whether a sales representative should be terminated for violating Policy 511 would depend on the precise circumstances of the violation.  (Doc. No. 45-18, p. 18). Nevertheless, he stated that the predominant factor in making such a determination would be whether the sales representative in question had committed violations on prior occasions.  (Doc. No. 45-18, p. 20).

James DiSanti ("DiSanti"), a former Wyeth sales representative, testified that sales representatives had been permitted to distribute VIS sheets for Rotoshield and Prevnar, but not for FluMist.  (Doc. No. 45-13, pp. 15-16).  According to him, the standard was different for FluMist, which had been brought to the market by another company.  *Id.*  DiSanti indicated that sales representatives were permitted to refer physicians and nurses to the CDC's website, where the FluMist VIS sheet could be retrieved.  (Doc. No. 45-13, p. 17).  It is not clear to the Court whether the Rotoshield and Prevnar VIS sheets had been approved by a Wyeth CCC. Nevertheless, the Court infers from the context of DiSanti's testimony that such approval may have occurred.  (Doc. No. 45-13, pp. 15-16)("Well, I know in the case of Rotoshield and Prevnar we were given access as far as to basically hand those materials out.  They were provided to us *by the company*, and we gave them out.")(emphasis added).  DiSanti further explained that while sales representatives were permitted to mention the discrepancy between the FluMist VIS sheet and the package insert, they were not permitted to show the VIS sheet to physicians and nurses. (Doc. No. 45-13, p. 46).

The Court has little trouble concluding, for the purpose of the instant motion for summary

judgment, that Wyeth has articulated a legitimate, nondiscriminatory reason for discharging Cobetto (i.e., Cobetto's failure to comply with Policy 511). The Court does not understand Cobetto to argue that he was in compliance with Wyeth's policies. Instead, he appears to believe that his termination was a disproportionate response to his conduct. In order to defeat Wyeth's motion for summary judgment, Cobetto "cannot simply show that [Wyeth's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). At trial, a plaintiff must show *both* that the reason for the employment decision articulated by the employer is false *and* that the real reason for the decision was discrimination on the basis of the relevant impermissible criterion. *Id.* at 763. Since the question is currently presented to the Court within the context of Wyeth's motion for summary judgment, the Court must view the evidence in the light most favorable to Cobetto. *Celotex*, 477 U.S. at 323.

In an attempt to cast doubt on Wyeth's reasons for terminating him, Cobetto attempts to establish that some of his conduct prior to the October 2003 field visit did not actually violate Policy 511. (Doc. No. 42, pp. 7-17). The first instance cited by him is the memorandum that Bencker sent to him on May 24, 2002. In that memo, Bencker chastised him for distributing an unapproved article to his colleagues. (Doc. No. 40-3, p. 5). Bencker instructed him to "use only approved POA material."[12]  *Id.*  Cobetto argues that his distribution of unapproved material to his colleagues did not constitute a violation of Policy 511, since no doctors were at the meeting and the information was shared only with his colleagues. (Doc. No. 42, pp. 7-8). Dennison testified that while Cobetto's distribution of this material to his colleagues constituted "bad judgment," it did not actually violate Policy 511. (Doc. No. 45-15, p. 17). Bencker apparently took a different view of the matter. She testified as follows:

Q.     Now, are you saying that that rule applied to Mr. Cobetto preparing a–distributing a newspaper at a meeting of other territorial representatives?

---

[12]In her deposition, Bencker explained that the term "POA material," as used in her memo to Cobetto, was indistinguishable from material approved by a Wyeth CCC. (Doc. No. 45-16, p. 45). The acronym "POA" stands for the words "plan of action." *Id.*

A.      It's non-POA material.

Q.      Was it promotional material?

A.      It is non-POA material.  It has not been through our CCC process.

Q.      It says, all promotional materials must be approved by a Wyeth CCC.
        Was he promoting the product to the other territorial representatives?

A.      We were at a promotional meeting.

Q.      And were there doctors there?

A.      That doesn't matter.  We were talking about a product.

(Doc. No. 45-16, pp. 48-49).  Bencker apparently believed that Cobetto was in violation of
Wyeth's policies, even if his actions did not actually violate those policies.[13]

Bencker's memo to Cobetto, however, was not limited to this single issue.  She also
warned him not to conduct promotional activities with those other than his assigned customers.
(Doc. No. 40-3, p. 5).  Cobetto testified that he had spoken with Jeff Neccuzi ("Necuzzi") of the
West Virginia Department of Health about West Virginia's shortage of Prevnar vaccines.  (Doc.
No. 45-11, pp. 6-11).  Neccuzi was apparently responsible for contacting the CDC for the
purpose of designating the number of vaccines to be sent to West Virginia.  (Doc. No. 45-11, p.
19).  Cobetto was not selling Prevnar vaccines directly to the West Virginia Department of
Health, but he discussed with several doctors and nurses his view that Necuzzi was not ordering
enough doses of Prevnar.  (Doc. No. 45-11, pp. 6-12).  After learning of Cobetto's criticism,

---

[13]The Court does not understand Wyeth's argument to be that these earlier instances were
*themselves* the reason for Cobetto's discharge.  Instead, Wyeth highlights Cobetto's history for
the purpose of establishing his awareness of Policy 511 during the period of time in which he
knowingly distributed FluMist VIS sheets to Wyeth customers.  (Doc. No. 46, p. 3).  Thus, the
question of whether his distribution of an unapproved article to his colleagues at a meeting
constituted a violation of Policy 511 is of no legal significance.  Cobetto was not discharged at
that time.  He was simply warned not to repeat such conduct.  (Doc. No. 40-3, p. 5).  To the
extent that Cobetto believes that Bencker misunderstood Wyeth's policies, no federal law
requires an employer to be "wise, shrewd, prudent, or competent."  *Fuentes v. Perskie*, 32 F.3d
759, 765 (3d Cir. 1994).

Necuzzi apparently complained about Cobetto to Dennison and Bencker in May 2002.  (Doc. No. 45-11, p. 21).  This complaint prompted Bencker to issue the memorandum of May 23, 2002, in which she warned Cobetto that "[u]napproved discussion of confidential or authorized complaints to customers which place a false and unfavorable light on the company could lead to disciplinary action, including discharge."  (Doc. No. 40-3, p. 5).  In that same memo, Bencker warned Cobetto not to distribute unapproved newspaper articles to his colleagues at meetings. *Id.*

Viewed in context, Bencker's chastisement of Cobetto in May 2002 for distributing an unapproved article to his colleagues was not the main purpose of the memo.  The memo appears to have been prompted by Neccuzi's complaint about Cobetto's criticism.  Although Bencker mentioned the article distribution, she only did so within the broader context of a memo focusing primarily on other matters.  Whether Cobetto's distribution of the unapproved article at a meeting actually violated Policy 511 is of no particular significance, since that action did not directly trigger anything other than a brief warning to refrain from repeating such conduct.  To the extent that Cobetto believes that Bencker's misunderstanding of Policy 511 in May 2002 undermines Wyeth's contention that he was discharged for being a serial violator of Policy 511, his argument is undermined by his own deposition testimony, in which he admitted to having told Scott that he had distributed FluMist VIS sheets to various customers.  (Doc. Nos. 40-2, p. 51, 46, p. 3).

Cobetto next argues that he did not violate Policy 511 during the fall of 2002 because the materials referenced in his September 2002 expense report constituted approved material.  (Doc. No. 50, p. 4).  This argument is difficult to reconcile with his deposition testimony.  Cobetto testified as follows:

> Q.   Well, Mr. Cobetto, you do not, in fact, know as a fact that anybody other than yourself was copying the VIS sheets; isn't that true?
>
> A.   No.  I know lots of people were copying VIS sheets, and I'll bet if you go back and look at expense reports from other people, you'll find them right on there.
>
> Q.   But Ms. Bencker was singling out you?
>
> A.   For this, she was.

Q.      But you have no way of knowing whether or not she cautioned or
        counselled [sic] anybody else who she found out was doing the same
        thing; isn't that true?

A.      I don't know about that.

Q.      Let me ask you, with respect to the VIS sheets, you certainly are not taking
        the position, Mr. Cobetto, that because the CDC issued a VIS sheet, that
        you were free to distribute it to the physicians this you called upon, are
        you?

A.      We did that, yes.

Q.      That is a blatant violation of policy 511, isn't it?

A.      According to what we've talked about, yes.  But every rep did it.

Q.      So 2 wrongs make a right?

A.      No.  You're going to fire all of us.  No.  Fire all of us.

Q.      Well, you weren't being fired in the fall of 2002.  You were being warned
        in the fall of 2002 that it was a violation of policy 511?

A.      And after that, it was--

Q.      Let me finish my question, Mr. Cobetto.

A.      I apologize.

Q.      You were being warned in the fall of 2002 that it was a violation of
        company policy to distribute–copy and distribute vaccine information
        sheets or any other promotional material that had not been approved by
        Wyeth's CCC; isn't that true?

A.      Yes.

Q.      And, in fact, just so that the record is clear, the CDC is the–is an arm of
        the Federal Government; correct?

A.      Correct.

Q.      The CDC has nothing whatsoever to do with Wyeth's CCC; isn't that

correct?

A.    I would assume that.

Q.    So the fact that the CDC issues a document does not render it an approved document by Wyeth's CCC; isn't that true?

A.    That's true.

Q.    And if, in fact, there was any confusion about that on your part in the fall of 2002 prior to being warned by Ms. Bencker, that alleged confusion on your part has been clarified and cleared up with the warning you received in the fall of 2002; isn't that true?

A.    I would agree to that.

Q.    And what you did, in fact, in the fall of 2002 that brought this to Ms. Bencker's attention was that you turned in on your September expense report charges for copying a large number of these VIS sheets at Kinko's and you were seeking to get reimbursed for that copying charge; correct?

A.    That's correct.

Q.    And she identified this because you had reflected on your expense report that you were copying these to distribute and had, in fact, distributed them to doctor's offices; correct?

A.    Yes.  I was very honest about it.

Q.    And she told you that was unacceptable under policy 511 and she warned you in writing about it?

A.    That's correct.

Q.    And that you were verbally warned about it, as well?

A.    Correct.

(Doc. No. 45-11, pp. 25-28).  Cobetto certainly did not *testify* that the materials referenced in his September 2002 expense report constituted approved material.  Instead, he acknowledged that they had not been approved.  Cobetto may have subjectively believed that he was authorized to

distribute VIS sheets to customers during the fall of 2002, but he admitted that any uncertainty on his part as to this issue had been cleared up long before the events leading to his discharge.  No reasonable jury could conclude that Cobetto, at the time of the October 2003 field visit, was unaware of the fact that Wyeth's policies prohibited him from distributing FluMist VIS sheets to customers.  His arguments are simply inconsistent with his own testimony.  (Doc. No. 50, p. 6)("Second, Cobetto also testified that he did not know that he could not hand out the VIS sheets, and would not, if he had known.").

Cobetto next argues that Wyeth never fired anyone else for a *single* Policy 511 violation.  (Doc. No. 50, p. 6).  It is difficult to fathom how he believes that Wyeth fired him for a *single* Policy 511 violation, since he admitted to Scott (shortly before Scott recommended his discharge) that he had distributed FluMist VIS sheets to *numerous* medical practices.  (Doc. No. 40-2, p. 51).  The Court need not address this issue further, since it is clear from Cobetto's own testimony that he was not fired only for a *single* violation of Policy 511.

Cobetto relies on *Tomasso v. The Boeing Company*, 445 F.3d 702, 707 (3d Cir. 2006), for the proposition that "the employee need not always offer evidence sufficient to discredit all of the rationales advanced by the employer" in order to cast doubt on the employer's rationales for an adverse employment action, and that such doubt can be established if the "core facts" of the employer's explanation are called into question.  (Doc. No. 42, pp. 3-5).  Having reviewed the evidence of record, however, the Court is convinced that the "core facts" are not in dispute.  Scott recommended Cobetto's discharge shortly after witnessing Cobetto violate (and hearing Cobetto admit to numerous other violations of) Policy 511.  Cobetto has done nothing to cast doubt on Wyeth's contention that it terminated him for ignoring his obligations under Policy 511.

In an attempt to refute Wyeth's asserted reasons for discharging him, Cobetto attempts to establish that Wyeth treated older males less favorably than it treated younger females.  (Doc. No. 42, pp. 13-16).  He relies on *Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515, 521 (3d Cir. 2003), in which the United States Court of Appeals for the Third Circuit explained that "[e]vidence of an employer's conduct towards other employees has long been held relevant and admissible to show that an employer's proffered justification is pretext."  (Doc. No. 42, p. 16).  *Ansell*, however, dealt with the issue of *admissibility*.  Wyeth does not challenge the admissibility

27

of Cobetto's evidence.  Instead, Wyeth argues that Cobetto's statistical information about its

*hiring* trends sheds no light on why he was *discharged*.[14]  (Doc. No. 39, pp. 14-15).  In light of

the other evidence contained in the record, the Court finds Wyeth's argument to be persuasive.

The record indicates that Scott, the individual who recommended Cobetto's termination,

hired three sales representatives during his tenure as a District Manager.  On October 27, 2003,

he hired Daniela Muchal, a 27-year-old female.  (Doc. Nos. 45-9, p. 30, 45-17, p. 58).  Shortly

thereafter, on December 15, 2003, Scott hired Kathleen Borgese, a 47-year-old female.  (Doc.

No. 45-9, p. 30).  The third sales representative hired by Scott was Devin Gosnell, a 27-year-old

male.  (Doc. No. 45-9, p. 29).  Gosnell, who commenced his employment with Wyeth on May 17,

2004, replaced Cobetto.  (Doc. No. 45-7, pp. 3-4).  Cobetto also argues that Lepore's termination

constitutes evidence of discrimination against older males.  (Doc. No. 42, p. 14).

The Court is not persuaded that Cobetto's evidence casts doubt on Wyeth's legitimate,

nondiscriminatory reason for discharging him.  The evidence concerning Scott's hiring decisions

(or even the broader category of Wyeth's overall hiring demographics) says nothing about the

demographics or qualifications of the applicant pool.[15]  (Doc. No. 45-9, pp. 29-34).  Moreover,

Lepore testified that his position had been eliminated as a result of a broader downsizing

decision.  (Doc. No. 45-19, p. 19).  He was apparently retained by Wyeth despite two prior

personnel cuts, but was discharged as a part of the third cut.  (Doc. No. 45-19, pp. 20-21).

Although Cobetto argues that Maruca replaced Lepore, Maruca testified that her territory

---

[14]In resolving a discovery dispute at an earlier stage in this litigation, the Court opined that since this was a discharge case involving a particular individual, Wyeth's hiring practices were not relevant for purposes of discovery.  (Doc. No. 29, p. 2).  The Court has also noted that "the standard for discoverability is far more lenient than that required for admissibility at trial." (Doc. No. 34, p. 2).  Although the Court takes note of Cobetto's evidence concerning Wyeth's hiring practices, the Court is nevertheless persuaded by Wyeth's argument that such evidence is not significantly probative of discriminatory animus with respect to Cobetto's termination.  (Doc. No. 39, pp. 14-15).

[15]Bencker testified that, during her brief tenure as a District Manager, she did not hire any male sales representatives.  (Doc. No. 45-16, p. 52).  Nonetheless, the record indicates that she only hired two sales representatives (i.e., Tamara Summa, a 26-year-old female, and Gretchen Pritts, a 28-year-old female).  (Doc. No. 45-9, pp. 30-31).  It is difficult for one to infer a discriminatory "pattern" from such a small sample of personnel decisions.

included regions which had previously been covered by three different sales representatives. (Doc. No. 45-19, p. 41).  It is also noteworthy that Maruca accepted the position because she, too, had lost her job at Wyeth because of downsizing.  (Doc. No. 45-19, p. 35).  Her only other option was to leave the company.  *Id.*  Nothing in the record appears to cast doubt on the reasons articulated by Wyeth for its decision to discharge Cobetto.

Despite Cobetto's focus on Bencker, there is no evidence that she was directly involved in the decision to terminate him.  Bencker testified that she served only as a "witness" when Scott informed Cobetto of his termination, and Cobetto points to no contrary evidence.  (Doc. No. 45-16, p. 29).  As far as the Court can tell, the only individuals involved in the decision to discharge Cobetto were Scott (a 42-year-old male), Dennison (a 54-year-old male), Campbell (a 44-year-old male), and Maddrey-Randolph (a 57-year-old female).  (Doc. Nos. 38, p. 12, ¶¶ 50-53, 43, p. 6, ¶¶ 50-53).

The Court acknowledges that members of a protected class of persons may sometimes discriminate against other members of that same class.  *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 78 (1998).  "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."  *Castaneda v. Partida*, 430 U.S. 482, 499 (1977).  It must also be acknowledged that Wyeth cannot defeat Cobetto's Title VII claim *solely* by establishing that he was replaced by another male (i.e., Gosnell).[16]  *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 353-354 (3d Cir. 1999).  Nevertheless, while the characteristics of the decisionmakers and Cobetto's replacement do not categorically defeat Cobetto's claims as a matter of law, such characteristics do provide a degree of evidentiary force to Wyeth's arguments.  *Id.* at 354 ("The fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force, and it would be prudent for a

---

[16]The Court notes that the Pennsylvania Human Relations Commission determined, with respect to the claims of gender and age discrimination under the PHRA, that Cobetto failed to establish a *prima facie* case of discrimination.  (Doc. No. 45-7, pp. 1-8).  The Court assumes *arguendo* that Cobetto can satisfy the *prima facie* hurdle because Wyeth concentrates its arguments on the second step of the *McDonnell Douglas-Burdine* inquiry (i.e., its legitimate, nondiscriminatory reasons for discharging Cobetto).

plaintiff in this situation to counter (or explain) such evidence.").  In light of the evidence presently before the Court concerning Cobetto's conceded violations of Wyeth's company policies, it is apparent that no reasonable jury could conclude that Cobetto's age was a determinative factor in Wyeth's decision to discharge him, or that his gender was a "motivating factor" in Wyeth's termination decision for purposes of § 2000e-2(m).

Wyeth attempts to buttress its position by arguing that Cobetto *concedes* that Scott, Dennison and Campbell did not act on the basis of a discriminatory animus.  (Doc. No. 46, p. 4). This argument is based on Cobetto's deposition testimony.  One cannot understand Cobetto's testimony, however, without first understanding the following language in Cobetto's complaint:

> 33.  Cobetto was victimized and harassed by his supervisor, a female, because his supervisor had animosity to Cobetto due to his age and his gender.

(Doc. No. 1, p. 7, ¶ 33).  In his deposition, Cobetto testified as follows:

> Q.  In paragraph 33, you allege that you were victimized and harassed by your supervisor, a female, and for now, I just want you to identify by name to whom you're referring to there.
>
> A.  Kim Bencker.
>
> Q.  Am I correct that at the time you were terminated, you were not supervised immediately by Ms. Bencker, but you had a male immediate supervisor; correct?
>
> A.  Correct.
>
> Q.  And his name was?
>
> A.  John Scott.
>
> Q.  So you are alleging that Mr. Scott was not part of this–did not victimize or harass you, but, rather, this was all attributed to Ms. Bencker?
>
> A.  Would you, please, repeat that?
>
> Q.  Well, I'm not referring to paragraph 33 now.  I'm asking you an independent question.  I think you acknowledged that at the time of your termination from employment, your immediate supervisor was John Scott, a male.

A.      Uh-huh.

Q.      Are you attributing any alleged harassment and/or victimization due to your age or gender, are you attributing any of that alleged conduct to Mr. Scott?

A.      No.

Q.      Are you attributing any of that alleged conduct to Mr. Dennison?

A.      No.

Q.      Are you attributing any of that alleged conduct to Mr. Campbell?

A.      No.

(Doc. No. 40-2, pp. 5-6).  Wyeth attempts to convince the Court that Cobetto is basing his entire case on the alleged discriminatory animus of Bencker, and that Cobetto's case must fail because Bencker played no role in the termination decision.  (Doc. No. 46, p. 4).  Although the question posed to Cobetto was prefaced with the words "I'm not referring to paragraph 33 now[,]" it is not clear whether Cobetto fully understood the question.  (Doc. No. 40-2, pp. 5-6).  Indeed, it is not even clear to the Court whether the words "alleged harassment and/or victimization due to your age or gender" referred to all of the allegations contained in the complaint, or only a more narrowly circumscribed category of "harrassment and/or victimization" (excluding the termination decision).  Obviously, if Cobetto attributes no discriminatory animus to those who actually made the decision to discharge him, he cannot prevail under Title VII or the ADEA.  Wyeth's reading of the transcript, however, is not consistent with Cobetto's more generalized allegations that he was the victim of a more generalized decision "to market Wyeth's products with a younger, mostly female, workforce."  (Doc. No. 1, p. 8, ¶ 37).  For this reason, the Court does not assume that Cobetto attempts to build his entire case on the alleged discriminatory animus of Bencker (who, contrary to the subjective beliefs of Cobetto, appears to have played no direct role in the termination decision).[17]  Instead, the Court assumes that paragraph 33 is

---

[17]The weak nature of Cobetto's evidence is highlighted by the reality that most (if not all) of Cobetto's allegations of discriminatory animus are directed at Bencker, who appears to have

intended to assert a "hostile work environment" claim against Wyeth on the basis of Bencker's actions, rather than to confine the Court's entire inquiry to the motivations of Bencker (as opposed to the motivations of all decisionmakers in a more collective sense). This assumption is buttressed by the language in Count IV of the complaint, which alleges a violation of the PHRA pursuant to a "hostile work environment" theory. (Doc. No. 1, p. 9, ¶ 44). The Court has already determined that Cobetto has failed to cast sufficient doubt on Wyeth's reasons for discharging him to defeat Wyeth's motion for summary judgment with respect to that issue. The Court's understanding of Cobetto's deposition testimony is, therefore, not of dispositive significance as to the circumstances surrounding his termination. Nevertheless, the Court must address the question of whether the record contains sufficient evidence to enable a reasonable jury to conclude that Bencker, during her tenure as Cobetto's District Manager, created a "hostile work environment" for Cobetto.

　　　In order to establish a violation of Title VII or the ADEA[18] under a "hostile work environment" theory, Cobetto must establish that he endured harassing behavior sufficiently severe to alter the terms, conditions or privileges of his employment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). An isolated incident amounts to a change in the terms, conditions or privileges of one's employment only if it can be fairly characterized as "extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The federal employment discrimination statutes prohibit only those forms of harassment which are severe or pervasive enough to create a hostile or abusive working environment. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-147 (2004). The standard is objective, making the subjective oversensitivity

---

played no role in the termination decision. Although Scott apparently considered Bencker's documentation of Cobetto's alleged misconduct when he recommended to Dennison that Cobetto be discharged, there is no evidence that Scott's reliance on such misconduct was merely a pretext for sex or age discrimination. Even if Cobetto's earlier conduct did not actually violate Policy 511, Cobetto could establish only that Scott was not "wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

　　　[18]It is unclear whether "hostile work environment" claims are cognizable under the ADEA. *Glanzman v. Metropolitan Management Corporation*, 290 F.Supp.2d 571, 581 (E.D.Pa. 2003). For the purpose of this case, the Court will assume *arguendo* that a plaintiff can proceed under the ADEA in accordance with such a theory.

of a particular plaintiff irrelevant.  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview.").  With that in mind, the Court now turns to Cobetto's evidence concerning Bencker's alleged harassment of him.

Cobetto described his relationship with Bencker during his deposition.  According to Cobetto, he had helped to train Bencker at the beginning of her career at Wyeth.  (Doc. No. 45-10, p. 18).  Nevertheless, he testified that their relationship took a turn for the worse when Bencker became his District Manager.  Bencker allegedly threatened to fire him on her first day on the job.[19]  (Doc. No. 45-10, p. 14).  Cobetto testified that Bencker was like a "pit bull," and that her expectations were unreasonable.  (Doc. No. 45-11, p. 46).  Bencker apparently wanted him to service physicians in a certain order, making it difficult for him to accommodate physicians who wanted to meet with him at specific times.  (Doc. No. 45-11, pp. 52-53).  He stated that she made him service areas in which he made little or no money.  (Doc. No. 45-11, p. 45).  Cobetto complained that, during field visits, Bencker would spend time discussing the adoption of her child that (in Cobetto's view) should have been spent discussing work-related matters.  (Doc. No. 45-12, p. 24).  He described a dinner (which the Court assumes to have been conducted at Wyeth's expense) at which Bencker refused to let him have an alcoholic beverage even though others were allowed to have their "desserts" of choice.  (Doc. No. 45-12, p. 21).  Cobetto could not remember whether anyone else had requested alcohol.  (Doc. No. 45-12, p. 22).

At one point, Cobetto was hospitalized.  Nevertheless, he tried to continue selling flu vaccines from his hospital bed.  (Doc. No. 45-12, p. 22).  Bencker "expected" Cobetto's wife to meet her at an airport in Pittsburgh to provide her with information related to Cobetto's work.  *Id.*  Although this occurred on only one occasion, Cobetto considered it to be "harassment."  *Id.*

---

[19]It is unclear to the Court whether Bencker's alleged threat was directed at Cobetto specifically, or whether it was merely a threat to fire any sales representative who failed to meet Bencker's expectations.  (Doc. No. 45-10, p. 42).  Nonetheless, the Court views the evidence, as it must, in the light most favorable to Cobetto.

He testified that Bencker tried to "bluff" him into moving to Morgantown, West Virginia.  (Doc. No. 45-11, p. 29).  Cobetto was apparently living in Greensburg, Pennsylvania, when a realignment of his territory occurred.  (Doc. No. 45-11, pp. 34-35).  After the realignment, Greensburg was no longer within his territory.  *Id.*  Bencker testified that she had told Cobetto that he would have to move only because she had been under the mistaken impression that a Wyeth sales representative was required to reside within his or her territory.  (Doc. No. 45-16, pp. 52-53).  After Dennison explained to Bencker that Cobetto could continue to reside in Greensburg as long as he was able to cover his territory, Bencker informed Cobetto that he would not have to relocate.  *Id.*  Although Bencker described the situation as a genuine misunderstanding, Cobetto viewed it as a deliberate attempt by Bencker to make him resign. (Doc. No. 45-11, pp. 36-37).

Although not entirely relevant to his own "hostile work environment" claim, Cobetto testified that Bencker had told Lepore that a monkey could do his job.  (Doc. No. 45-10, p. 31). Bencker testified that she had put Lepore "on notice" because of his job performance, and not because of conduct-related issues.  (Doc. No. 45-16, pp. 5-6).  She was apparently on leave when Lepore's territory was eliminated.  (Doc. No. 45-16, p. 7).  DiSanti testified that he could not recall seeing Bencker demean or harass Cobetto.  (Doc. No. 45-13, p. 41).  He described Bencker as "professional."  (Doc. No. 45-13, p. 37).  He did not consider her to be verbally abusive. (Doc. No. 45-13, pp. 28-29).  In his view, Berger had been an abusive manager.  (Doc. No. 45-13, pp. 26-27).  DiSanti did not like it when Bencker made reference to Berger's records of his past performance.  (Doc. No. 45-13, pp. 37-38).

Having reviewed the evidence contained in the record, the Court is convinced that Cobetto's allegations of "harassment" are insufficient to enable a reasonable jury to conclude that Bencker made his working environment sufficiently abusive to constitute a "hostile work environment."  The federal employment discrimination statutes are not implicated by trivial conduct of the kind described in Cobetto's testimony.  *Clark County School District v. Breeden*, 532 U.S. 268, 270-271 (2001).  In so observing, the Court acknowledges Cobetto's testimony about a panic attack that he suffered prior to a scheduled flight, which he attributed to "pressure" to sell that had been put on him by Bencker.  (Doc. No. 45-12, p. 69).  It cannot be doubted that

34

"[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by simple recitation of the words used or the physical acts performed."  *Oncale*, 523 U.S. at 81-82.  Nevertheless, the courts would surely be overwhelmed if every employee who felt "pressure" to effectively perform the duties of his or her job could pursue a "hostile work environment" claim under Title VII or the ADEA.  If the alleged actions of Bencker left Cobetto with the subjective impression that his work environment was sufficiently abusive to be actionable under federal law, it is the Court's view that his impression is not objectively reasonable.

Even when viewed in the light most favorable to Cobetto, the evidence of record is not sufficient to enable a reasonable jury to conclude that Cobetto's sex or age was a determinative factor in Wyeth's decision to discharge him (or that Cobetto's sex was a "motivating factor" in the discharge decision under § 2000e-2(m)).  The evidence is also insufficient to enable a reasonable jury to conclude that Bencker's "harassment" of Cobetto was sufficiently severe or pervasive to make his working environment hostile or abusive.  Thus, Wyeth is entitled to summary judgment with respect to Counts I and II of Cobetto's complaint.  (Doc. No. 1, pp. 7-8, ¶¶ 30-39).  Moreover, since the PHRA is construed coextensively with the applicable federal statutes in this case, Wyeth is entitled to summary judgment with respect to Count IV of the complaint.  (Doc. No. 1, p. 9, ¶¶ 44-46).  It remains to be determined whether Wyeth is also entitled to summary judgment with respect to Count III, which alleges that Wyeth violated ERISA.  (Doc. No. 1, p. 8, ¶¶ 40-43).

Cobetto alleges that Wyeth discharged him, in part, because it wanted to avoid paying him retirement benefits.  (Doc. No. 1, pp. 8-9, ¶¶ 40-43).  ERISA makes it unlawful for an employer to discharge an employee for the purpose of interfering with his or her attainment of a right under an employee benefit plan.  29 U.S.C. § 1140.[20]  In order to prevail in his ERISA

_____

[20]In his complaint, Cobetto purports to rely on 29 U.S.C. § 1141, which makes it "unlawful for any person through the use of fraud, force, violence, or threat of the use of force or violence, to restrain, coerce, intimidate, or attempt to restrain, coerce, or intimidate any participant or beneficiary for the purpose of interfering with or preventing the exercise of any right to which he is or may become entitled under the plan . . ."  (Doc. No. 1, p. 9, § 43).  Nevertheless, it is clear from his averments that his ERISA claim is based on Wyeth's decision to

claim, Cobetto must establish that: (1) Wyeth engaged in prohibited employer conduct (i.e., Wyeth discharged Cobetto); and (2) Wyeth's action was taken for the purpose of interfering with Cobetto's attainment of any right to which he may have become entitled had he not been discharged. *Romero v. Smithkline Beecham*, 309 F.3d 113, 119 (3d Cir. 2002). While it is not necessary for Cobetto to establish that Wyeth's sole purpose for discharging him was to prevent his attainment of benefits, he must demonstrate that Wyeth acted with the "specific intent" to interfere with his rights under ERISA. *Dewitt v. Penn-Del Directory Corporation*, 106 F.3d 514, 522 (3d Cir. 1997). It is not sufficient for him to show that he lost benefits as an incidental result of his termination. *Id.* at 522-523.

Wyeth relies on Cobetto's deposition testimony to establish that Cobetto has no "concrete" evidence to support his ERISA claim. (Doc. No. 39, p. 18). Cobetto testified as follows:

> [Q.]   Provide for me each and every bit of information that leads you to believe that a reason for the decision to fire you was the savings that would inure to Wyeth because of these benefits.
>
> A.   By replacing me with an individual making half as much money, Wyeth was going to save a lot of money. They were also going to get out from under the commitment that they owed me for working for them for 16 or 17 years because they–by firing me, they wouldn't have to pay for my medical benefits come retirement age. They wouldn't have to give me my pension fund money which I should get come retirement age, my health insurance, my life insurance, and all those things.
>
> Q.   Okay. What other information, if any, do you have that supports your allegation that a reason for the decision to fire you was the savings to Wyeth of your benefits?
>
> A.   I just answered that.
>
> Q.   I'm asking you whether there is anything else other than what you've just

---

discharge him rather than on a theory of retaliation, coercion or force. (Doc. No. 1, p. 8, ¶¶ 41-42). For this reason, Wyeth construes Count III of the complaint to allege a violation of 29 U.S.C. § 1140, which specifically governs discharge decisions of the kind at issue in this case. (Doc. No. 39, p. 17). The Court agrees with Wyeth insofar as it believes that § 1140, rather than § 1141, provides the applicable framework for evaluating Count III.

said?

A.      At this point, I don't have anything else.

Q.      And am I correct, if you look at paragraph 42 where you said that Wyeth
        was motivated to dismiss you because of your entitlement to a pension,
        that there is nothing else, no other information other than what you've
        already testified to that you believe supports that allegation?

A.      Correct.

Q.      When you–what was your–what is your understanding of when you would
        have been eligible to retire with a full defined benefit pension from
        Wyeth?

A.      I think it was after 20 years with the company or age 55.  I think that's
        what it was, but I'm not sure.

(Doc. No. 40-2, pp. 8-9).  In his filings, Cobetto makes no attempt to shed further light on the
basis for his ERISA claim, focusing all of his energies on his sex and age discrimination claims.
(Doc. Nos. 42, pp. 12-19, 50, pp. 8-9).  Cobetto's ERISA claim is apparently based solely on
speculation, and it cannot survive Wyeth's motion for summary judgment.  Such "vague
allegations of malicious termination, unsupported by any facts, are insufficient."  *Romero*, 309
F.3d at 119.

        Cobetto's ERISA claim is further undermined by Lepore's testimony.  Lepore testified
that while his last day of work at Wyeth was December 2, 2002, he was permitted to remain on
the payroll (and receive his salary) through April 30, 2003, so that he could reach the age of 55 as
a Wyeth employee.  (Doc. No. 40-15, p. 9).  He apparently needed to reach the age of 55 as a
Wyeth employee in order to be eligible for retirement benefits.  *Id.*  In light of Lepore's testimony
and Cobetto's complete failure to provide any evidence in support of his ERISA claim, no
reasonable jury could conclude that Wyeth's decision to discharge Cobetto was motivated by a
desire to avoid the payment of his benefits.  Accordingly, Wyeth's motion for summary judgment
must also be granted with respect to Count III of Cobetto's complaint.

<u>**Conclusion**</u>

        Although Cobetto alleges that Wyeth terminated him in violation of Title VII, the ADEA,

37

the ERISA and the PHRA, the evidence contained in the record clearly demonstrates that he violated Wyeth's company policies in spite of numerous warnings not to do so.  Consequently, no reasonable jury could conclude that Wyeth discharged him because of his sex, age or entitlement to retirement benefits (or that his sex was a "motivating factor" in Wyeth's discharge decision).  The majority of Cobetto's allegations (if not *all* of his allegations) are directed at an individual who apparently did not participate in the decision to discharge him.  Moreover, Cobetto's testimony (which is assumed to be true for purposes of the instant motion for summary judgment) is insufficient to enable a reasonable jury to conclude that Bencker's harassment of him was "severe or pervasive enough to create an objectively hostile or abusive work environment[.]" *Harris*, 510 U.S. at 21.  Consequently, the Court must grant Wyeth's motion for summary judgment.  An appropriate order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BERNARD J. COBETTO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-1677** |
| | ) | |
| **WYETH PHARMACEUTICALS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**ORDER OF COURT**</u>

AND NOW, this 15th day of October, 2007, in accordance with the foregoing memorandum opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that Defendant's Motion for Summary Judgment (*Document No. 37*) is **GRANTED**.

The Clerk is directed to docket this case closed.

BY THE COURT:

s/  Terrence F. McVerry
_____
United States District Court Judge

cc:   Martha Hartle Munsch
      Reed Smith
      Email: mmunsch@reedsmith.com

      Edward A. Olds
      1007 Mount Royal Boulevard
      Pittsburgh, PA 15223